**William W. WELSH, Petitioner,**

v.

**RAILROAD RETIREMENT
BOARD, Respondent.**

No. 81–1055.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 18, 1981.

Decided Dec. 2, 1981.

Bartley, Goffstein, Bollato & Lange, John H. Goffstein, argued, Clayton, Mo., for petitioner.

Edward S. Hintzke, Asst. Gen. Counsel, Karl T. Blank, Gen. Atty., argued, Steven

A. Bartholow, Acting Gen. Counsel, Chicago, Ill., for respondent; Railroad Retirement Bd., Chicago, Ill., of counsel.

Before BRIGHT, HENLEY, and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

William W. Welsh appeals from the Railroad Retirement Board's denial of his claim for an employee disability annuity under Section 2(a)(1)(iv) of the Railroad Retirement Act of 1974, 45 U.S.C. § 231a(a)(1)(iv) (1976). We conclude that the Board's decision is not based on substantial evidence, and we remand the case with directions that the Board award the requested disability annuity to Welsh.

## I.

William Welsh worked for the Railway Express Agency (REA) for more than 20 years until November 6, 1975, when the REA went out of business. Welsh was employed at the REA as a warehouse and platform laborer, and he has been unable to get another job since he lost his REA position. On March 6, 1978, Welsh applied to the Railroad Retirement Board for an employee disability annuity, claiming that as of June 9, 1977, he was disabled due to a combination of diabetes, hypertension, and arteriosclerosis. Later Welsh expanded his list of disabling conditions to include, inter alia, degenerative arthritis and an enlarged prostate with partial loss of urinary control.

The Railroad Retirement Act of 1974 contains two different provisions for disability annuities: one for employees disabled for work in their regular occupation and another for employees disabled for any type of regular employment.[1] Because Welsh had maintained his current connection with the railroad industry and had completed more

---

1. The pertinent sections of the Railroad Retirement Act of 1974 follow:

   § 231a.   Annuity eligibility requirements
   (a)(1)  The following-described individuals, if

they shall have completed ten years of service and shall have filed application for annuities, shall, subject to the conditions set forth in subsections (e), (f), and (h) of this section,

than 20 years of railroad service, he fell under the former provision. As a result, in order to be eligible for an annuity, he needed to show only that he was unable to perform his regular occupation of warehouse and platform laborer, a job which at times involved arduous physical labor.

Pursuant to authority granted by Section 2(a)(2) of the Railroad Retirement Act, 45 U.S.C. § 231a(a)(2), the Board has established standards for occupational disabilities in various railroad occupations. The relevant standards as promulgated by the Board for disability in Welsh's regular occupation include the following:

*Cardiovascular System*

—Hypertension 170/100 with or without heart findings, with evidence of arteriosclerosis.

—Continued prolonged loss of strength accompanied by arteriosclerosis.

—Loss of circulation of extremities with continuous symptoms and/or gangrenous changes.

—Severe arteriosclerosis, with symptoms.

*Bones and Joints*

—Arthritis all types with 50 percent limitation of motion of either the cervical, dorsal, lumbar, or sacroiliac spine.

*General Medical Condition*

—Diabetes mellitus controllable by diet and insulin with loss of bodily vigor.

—Loss of urinary and/or anal sphincter control due to any cause.[2]

After consideration of the various medical reports describing Welsh's state of health, the Board (with one member dissenting)

decided Welsh's disability did not qualify him for an annuity under any of the above standards. We disagree.

## II.

Welsh was first diagnosed as having mild arterial hypertension after an examination at Walter Reed Army Hospital on August 8 and 9, 1951, in which his blood pressure readings ranged from 140/96 to 152/98. His hypertension apparently remained untreated until 1977, when he began taking medication (Aldomet) for it.[3] Since 1977, Welsh's blood pressure has been measured to be over or near the Board's disability standard of 170/100 at several examinations.

On March 21, 1977, Welsh had an extensive cardiovascular examination at the Veterans Administration Hospital in St. Louis. His blood pressure was 190/120 standing, 186/120 recumbent, 210/120 after exercise, and 184/118 two minutes after exercise. On the basis of this examination, the Veterans Administration assigned Welsh an overall disability rating of 50%: 40% from a heart condition secondary to hypertension and 10% from retinitis. On June 9, 1977, Welsh was admitted to the Christian Hospital, Northeast in St. Louis with gall-bladder problems, for which he had a cholecystectomy (removal of the gall bladder) on June 12. Upon admission to the hospital his blood pressure was 180/98, and at discharge it was 176/100.

Late in 1978 Welsh applied for a job with the Postal Service in St. Louis which involved duties comparable to those of his job

---

be entitled to annuities in the amounts provided under section 231b of this title—

\* \* \* \* \* \*

(iv) individuals who have a current connection with the railroad industry, whose permanent physical or mental condition is such as to be disabling for work in their regular occupation, and who (A) have completed twenty years of service or (B) have attained the age of sixty; and

(v) individuals whose permanent physical or mental condition is such that they are unable to engage in any regular employment.

45 U.S.C. § 231a(a)(1)(iv) and (v) (1976).

2. See Record of proceedings before the Board (hereinafter Record) at 15–21 for the complete list of the Board's disability criteria in the above categories.

3. Welsh states he has taken Aldomet since October 1977, and his personal physician's report corroborates his statement. See Record at 102–03.

with the REA.[4] At his pre-employment physical, which took place at the Sutter Clinic in St. Louis on October 13, 1978, Welsh's blood pressure readings were 150/106 and 168/110. On the basis of these results, the Postal Service decided Welsh did not meet the physical requirements of the job because of hypertension.

The record of Welsh's office visits to his regular physician in 1977 and 1978 shows a range of blood pressure readings from 150/100 (on October 13, 1977, and February 16, 1978) to 120/80 (on October 6, 1978). Welsh was examined for hypertension by a Board examiner on May 31, 1978, at which time his blood pressure was 140/90 sitting and 140/100 standing. The Board decided that although Welsh's blood pressure had exceeded 170/100 in the past, his hypertension was not disabling.

Welsh applied for a second Postal Service position comparable to his REA job[5] and was again rejected in November 1978. This time the Postal Service informed him he was unsuitable because he had failed the back x-ray. Welsh's x-ray, taken November 8, 1978, in his pre-employment physical, showed degenerative arthritic changes in the lower spine.

On March 27, 1979, Welsh underwent a Board-ordered back examination to determine the extent of his back condition. This examination confirmed that Welsh had degenerative arthritic changes in the lumbosacral vertebrae, but the Board decided the condition was not severe enough to disable Welsh for his regular railroad occupation.

In addition to hypertension and back problems, Welsh claims he suffers from arteriosclerosis, diabetes, Dupuytren's contracture, enlarged prostate with partial loss of urinary control, loss of balance, dizziness, fatigue, and prolonged loss of strength. The various medical reports confirm the existence of the first three of these conditions. The diabetes has been controlled by diet and medication (Tolinase). The remaining complaints are not discussed in any of the medical evidence.

III.

"The issue on appeal is whether the Board's decision is supported by substantial evidence, is not arbitrary, and has a reasonable basis in law." *Williams v. U.S. Railroad Retirement Board*, 585 F.2d 341, 343 (8th Cir. 1978). For the following reasons, we conclude that substantial evidence in the record as a whole does not support the Board's conclusion that Welsh is not disabled for his regular railroad occupation.

With respect to Welsh's hypertension, the Board acknowledges that on several occasions Welsh's blood pressure has registered well over the disability standard of 170/100. Nonetheless, the Board declined to find Welsh disabled on this basis because, as one Board member put it, "[p]ersonal physician and Board examiner found 120/80 and 140/90 respectively, in *most recent* examinations." (Concurrence of Board Member Oliver in Board's decision, Record at 160 (emphasis in original)). The fact is, however, that Welsh's most recent documented blood pressure reading occurred at his first pre-employment physical for Postal Service employment on October 13, 1978, at the Sutter Clinic. At that time his blood pressure was measured at 168/110, and because of his hypertension the Postal Service refused to hire him for the position, which was "not significantly different from [his] REA occupation." *Ibid.*

Given Welsh's history of blood-pressure readings near or over 170/100, his 50% overall disability rating by the Veterans Administration based primarily on a heart condition secondary to hypertension, and the

---

4. The job description follows: "Must handle heavy sacks of letter mail, parcel post and paper mail, weighing 70 pounds, must sort and distribute mail and perform other related duties. The work is of an arduous nature, involving continuous standing, walking, stretching to empty sacks and reaching." Record at 98.

5. The job description follows: "Clerks are assigned to handle heavy sacks of parcel post and paper mail. These sacks weigh up to 70 pounds. The work is of an arduous nature and involves standing, walking, throwing packages of mail, etc." Record at 170.

Postal Service's refusal to hire him for a job substantially equivalent to his job at the REA because of his hypertension, we hold that the Board's assessment that Welsh's hypertension is not disabling is not supported by substantial evidence on the record as a whole.[6]

We also cannot agree with the Board's interpretation of the evidence concerning Welsh's back condition. Degenerative arthritis of the lower spine was first diagnosed after Welsh's second pre-employment physical for Postal Service employment, and the Postal Service denied his application because of his back problem. Welsh's subsequent Board-ordered orthopedic examination confirmed the existence of a back problem, but the Board declined to consider that as evidence of disability, because Welsh maintained he thought he could perform the job despite his back problem.

> [Welsh] told Dr. Holscher in March 1979 that he strongly felt he could perform a post office job he had applied for as his back had never given him difficulty in the past other than very brief episodes of catchy pain discomfort several times a year. In the light of this evidence the Board attributes little weight to the fact that his application for this job, as a mail handler, was denied because of a finding of a back condition.

Decision and Order of the Board, Record at 5.[7]

We think the proper conclusion to be drawn from Welsh's applications for Postal Service employment is not that he subjectively felt capable of doing the work, but rather that he was turned down because of his physical disability. It is not hard to understand why Welsh claimed he could do the job. He has been unemployed for six years, and has had very limited income during that time. He is not a malingerer and has tried to obtain employment for which he felt his prior experience qualified him, but he has been told by an agency of the government that he is physically unfit to perform duties comparable to those of his REA occupation. The fact that this man would like to work to support himself and his family should not be held against him. The objective evidence, when considered as a whole, demonstrates rather clearly that he is unable to return to his regular occupation because of his physical disabilities.

### IV.

Claimant's blood pressure has been measured to be over or near the Board's disability standard several times, and he has been denied employment involving duties like those of his regular occupation because of his hypertension and back condition. Accordingly, we reverse the Board's decision and remand with directions to award the requested disability payments.

---

**6.** We also question the Board's reliance on blood-pressure readings which were not taken after exercise. The Board's regulation establishing 170/100 as the disabling level for Welsh's occupation does not indicate whether the reference is to a resting blood-pressure reading or one taken after exercise. In view of the physical labor involved in Welsh's job, however, blood-pressure readings taken after exercise are at least relevant, if not controlling. It appears from the record that the only measurement of Welsh's blood pressure after exercise took place during his cardiovascular examination at the Veterans Administration Hospital on March 21, 1977. The reading was 210/120. Although the lower readings cited by the Board are more recent, they were apparently taken while Welsh was at rest.

**7.** To the same effect see Decision of the Appeals Referee, Record at 11; Concurrence of Board Member Oliver, Record at 160; and Concurrence of Board Member Adams, Record at 161. On the other hand, the dissent of Board Member Chamberlain, Record at 158–59, takes the same view of the Postal Service evidence that we do.