**James FREELS, Petitioner,**

**v.**

**UNITED STATES RAILROAD RETIREMENT BOARD, Respondent.**

**No. 88–2038.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1989.

Decided July 10, 1989.

Rehearing and Rehearing En Banc Denied Oct. 3, 1989.

---

Timothy C. Harlan, Columbia, Mo., for petitioner.

Edward S. Hintzke and Steven A. Bartholow, Chicago, Ill., for respondent.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

MAGILL, Circuit Judge.

James William Freels appeals from the Railroad Retirement Board's [1] denial of his application for an occupational disability annuity under section 2(a)(1)(iv) [2] of the Railroad Retirement Act of 1974.[3] 45 U.S.C. § 231a(a)(1)(iv) (1976). Freels claimed that he became disabled for work in his regular occupation after his employer, the Norfolk & Western Railroad (N & W), caused him to be exposed to toxic chemicals. The Board affirmed and adopted the findings of the appeals referee, Rachel L. Simmons, who concluded that because Freels' description of his impairment and resulting disability was not fully credible or supported by substantial evidence in the record, he was not entitled to an occupational disability annuity. We hold that the Board's decision was based on substantial evidence and, accordingly, we affirm.

## I.

James Freels, a 53–year–old ex-employee of N & W, worked for eighteen years (1964–1982) as a railroad welder's assistant and as a full-fledged railroad welder. His job included lifting heavy equipment and a variety of other strenuous motions. Freels claims that in January 1979, he was exposed to the chemicals phenol and dioxin when N & W assigned him to participate in the cleanup of a chemical spill at Sturgeon, Missouri. Two to three years after the cleanup, Freels stopped working for the railroad. He contends that his twenty-four-day exposure to the chemicals caused him to suffer headaches, fatigue, shortness of breath, muscle pain and other symptoms that, in aggregation, rendered him unable to work.

---

1. Jurisdiction in this court is based on the Railroad Recovery Act, 45 U.S.C. § 355(f), which provides for review in the courts of appeal from all final decisions of the Railroad Retirement Board.

2. Freels originally applied for benefits under § 2(a)(1)(v) of the Act, but during the course of the application process, changed circumstances (*see infra* p. 337) enabled him to seek benefits under the more favorable terms contained in § 2(a)(1)(iv). For the terms of § 2(a)(1)(iv), *see infra* Section II.

3. "The Railroad Retirement Act, like the Social Security Act, provides workers and their families with protection against hardships created by the loss of earnings due to illness or old age." *Peterson v. United States R.R. Retirement Board,* 780 F.2d 1361, 1363 (8th Cir.1985) (citing *Mathews v. DeCastro,* 429 U.S. 181, 185–86, 97 S.Ct. 431, 434–35, 50 L.Ed.2d 389 (1976)).

On May 10, 1984, Freels applied to the Railroad Retirement Board for disability benefits. The Board's Bureau of Retirement Claims, after considering various medical reports describing Freels' state of health, denied his application. He then requested reconsideration, and once again his application was denied. On April 8, 1985, Freels filed an appeal. Prior to the appeal hearing, Freels reached a settlement with the railroad for $395,932.40. Pursuant to the settlement, Freels was credited with twenty years of railroad service. This period of time was sufficient to make Freels eligible for an occupational disability annuity under § 2(a)(1)(iv) of the Railroad Recovery Act, 45 U.S.C. § 231a(a)(1)(iv) (1976).[4]

Freels' appeal hearing took place on May 14, 1987 in Kansas City. Freels testified concerning the work he performed for N & W and the ailments that allegedly forced his retirement. The appeals referee, finding that Freels' allegations concerning his physical condition and its impact on his ability to work were not credible, affirmed the Bureau of Retirement Claims' denial of Freels' application. One month later, a majority of the three-member Railroad Retirement Board affirmed and adopted the appeals referee's decision.

## II.

On appeal, Freels contends that the Board's decision not to grant him an occupational disability annuity is not supported by substantial evidence. Specifically, he claims that the appeals referee underestimated (1) the importance of his medical experts' testimony, and (2) erroneously refused to give adequate weight to his subjective, nonclinical evidence of mental impairment caused by his anxiety about the alleged physical effects of his lengthy exposure to the chemicals. The Board counters that the appeals referee correctly concluded that there is not adequate proof in the record indicating that Freels was disabled for work in his regular occupation under § 2(a)(1)(iv).

Section 2(a)(1)(iv) of the Railroad Retirement Act provides, in pertinent part, that in order to qualify for an occupational disability annuity, an individual must "have a *current connection* with the railroad industry, [a] *permanent physical or mental condition* * * * such as to be *disabling for work in [his] regular occupation* * * *, have completed *twenty years of service,* or * * * have attained the age of sixty." 45 U.S.C. § 231a(a)(1)(iv) (emphasis added). A decision by the Board as to an individual's eligibility for annuities is not to be set aside so long as it is "supported by substantial evidence, is not arbitrary, and has a reasonable basis in law * * *." *Williams v. U.S. Railroad Retirement Board,* 585 F.2d 341, 343 (8th Cir.1978). *See also Peterson v. R.R. Retirement Board,* 780 F.2d at 1364; *Costello v. U.S. R.R. Retirement Board,* 780 F.2d 1352 (8th Cir.1985). The *Peterson* court emphasized that

[w]hile we are not free when reviewing an agency decision under this standard simply to substitute our decision for that of the agency, we must set aside the decision if we 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of the evidence opposed to the [agency's] view.'

*Id.* at 1364 (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Arp v. Railroad Retirement Board,* 850 F.2d 466 (8th Cir.1988).

Since Freels' connection with the railroad industry and length of service are not in dispute, our task is to assess the evidence supporting the Board's conclusion that Freels was not permanently disabled for work in his regular occupation. As a railroad welder, Freels was involved primarily in track repairs. The appeals referee

---

**4.** *See supra* note 2.

found that Freels' "job was performed at the heavy exertional level * * * ":

> He used a sledgehammer, small tools, oxygen and acetylene tanks, angle bars, saws, and drills. Some tools (such as the tanks) weighed up to 200 pounds and two people would be needed to carry it. Other tools (such as a hose) weighed about 50 pounds and one person could carry it. * * * Appellant * * * walked about one-third of the time, sat while he welded, constantly was bending, stooping, crouching, and reaching, and was lifting and carrying three or four times a day.

Decision of appeals referee, Appeal No. 17,078 at 4 (October 14, 1987).

The cleanup of toxic chemicals in which Freels participated took place in January 1979. In June 1981, Freels began to suffer physical symptoms that hindered his work performance. He then started a course of examinations that yielded a number of strikingly dissimilar evaluations of his condition and his ability to continue to work as a railroad welder. Freels was first examined in July 1981 by Dr. Bertram W. Carnow. Dr. Carnow, of Carnow & Associates, Ltd., Occupational and Environmental Health Consultants, concluded that because of his exposure to the chemicals, Freels had "developed multiple illnesses and diseases which have been progressive." Exhibit 8. "He has other symptoms suggesting damage to his muscular and nervous system[.]" Exhibit 9. Dr. Carnow emphasized that because of Freels' increasing fatigue and pain, he was unable to work for extended periods: "[the symptoms] have now reached a stage where it is impossible for him to function adequately to carry out his responsibilities with the railroad. Based on the nature of his problems and the progression of disease, I feel that it is necessary to recommend he remove himself from this activity." Exhibit 8. During the next twelve months, Dr. Carnow examined Freels on "a number of occasions," Exhibit 9, and concluded that the situation was worsening, making extended physical exertion impossible for Freels. A second doctor, Samuel Bernstein, a licensed psychologist and vocational expert, examined Freels in November 1981. He concluded that Freels was unable to perform a normal workday and was thus "totally unemployable." Exhibit 10.

In September 1982, Freels was examined again at the request of the Board. This examination, by Dr. Max T. Gutensohn, a specialist in internal medicine/neurology, gave rise to a report indicating that Freels' examination results were "all normal," Exhibit 12, although a chest x-ray revealed that he suffered from chronic obstructive pulmonary disease and another test showed early indications of obstructive lung disease. Dr. Gutensohn's two salient impressions were that (1) Freels had experienced "[e]xposure to innocuous chemical; and (2) [d]eterioration of health is evidenced by many organ systems involvement, however, none are very specific." *Id.* Further examination by Dr. Gutensohn in 1983 revealed moderate working capacity and some "improvement of [Freels'] symptoms," but Freels continued to insist that his working capacity was decreasing.

In April 1984, Freels was examined by Dr. James N. Hueser, an oncologist based at the Columbia Clinic of Columbia, Missouri. Dr. Hueser concluded that Freels was "disabled for a number of reasons, primary of which is marked fatigue secondary to exposure to toxic chemical[s] * * *." When Freels was hospitalized for surgery later that month, his condition was found not to be as alarming as Dr. Hueser had suggested. The tests indicated:

(1) pulmonary function—87%;

(2) blood tests—normal;

(3) urinalysis—normal;

(4) EKG—normal.

In September 1984, Freels again had "normal" test results on a chest x-ray and EKG. Referring physician Dr. Norman Clarkson, of the Kirksville Osteopathic Health Center of Kirksville, Missouri, compiled a report based on the tests, emphasizing that Freels was a one- to two-pack a day smoker and that Freels was "in no acute distress * * * even though he does have evidence of obstructive pulmonary disease [, it] doesn't seem at this time that it's severe enough * * * to preclude his

[carrying] out some form of gainful employment." Exhibit 38.

In May of the following year, Freels underwent detailed psychological examinations. His condition was first studied by Helen J. Roehlke, a licensed psychologist. Dr. Roehlke applied the Minnesota Multiphasic Personality Inventory (MMPI) exam, which indicated that Freels suffered a "generalized anxiety disorder" and "adjustment disorder with mixed emotional features." Exhibit 40. She ultimately concluded that Freels was precluded by his condition from being successfully employed in any ordinary work setting. *Id.* Freels was later studied by Blake T. Anderson, M.A., via the Wechsler Adult Intelligence Scale–Revised (WAIS–R) exam, which revealed no impairments or abnormalities in functioning whatsoever. Exhibit 41.

Finally, in October 1985, Dr. Don R. Whitener, a specialist in pulmonary diseases and a colleague of Dr. Hueser at the Columbia Clinic, performed another battery of tests on Freels. Having assessed the results of Freels' pulmonary function tests, Dr. Whitener reported that Freels' ability to lift/carry, stand/walk, sit, climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push/pull, see and speak were not affected by his "mild obstructive defect." Exhibit 42. Dr. Whitener concluded that Freels "does have mild obstructive airways disease which I think is related to his prior cigarette smoking but this is not significant enough to prevent him from working." *Id.*

The conclusions reached by the doctors who examined Freels and assessed his working capacity are far from harmonious. Although none of the doctors crafted their conclusions in language similar to that in § 2(a)(1)(iv), four of the specialists who examined Freels (Gutensohn, Clarkson, Anderson, and Whitener) appear to have concluded that he was not disabled for work in his regular occupation; four others (Carnow, Bernstein, Hueser, and Roehlke) apparently asserted the contrary. Since the evidence in the record both supports and undercuts Freels' claims, the *Williams* and *Peterson* cases (*see supra* p. 337) are particularly significant. They state unequivocally that we could not substitute our judgment for that of the Board even if we were so inclined. Although this is a close case, we hold that the record, viewed in its entirety, does contain substantial evidence supporting the Board's denial of the annuity sought by Freels. The appeals referee's decision was based on comprehensive testimonial and documentary evidence covering all of the physical and psychological dimensions of Freels' alleged impairment. In the appeals referee's judgment, several of the medical reports apparently finding that Freels was disabled for work in his regular occupation were "conclusory" and "unsupported by clinical or laboratory findings." Decision of appeals referee at 8. Conversely, she found that Freels' complaints are "in part * * * disproved by specific clinical findings" (i.e., blood tests, urinalysis, EKG exams, etc., that had "essentially normal results"). *Id.* at 9.

### III.

Having carefully reviewed the record, we are persuaded that the appeals referee's decision that Freels is not disabled for work in his regular occupation and thus not entitled to an occupational disability annuity is supported by substantial evidence. The Board therefore was not unreasonable in its adoption of the appeals referee's finding that Freels failed to prove that he suffered the disability and resulting inability to perform the duties of his regular occupation required by § 2(a)(1)(iv). We affirm.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent. First, there is no evidence in this record that Freels can return to his past work as either an assistant welder or a welder. As the majority points out, the referee found that his past jobs were "heavy work" within the meaning of 20 C.F.R. § 404.1567(d). Yet, no one testified that Freels can perform heavy work. Second, the referee erred as a matter of law in disregarding the evidence presented

with respect to Freels' psychological impairments. When his physical and psychological impairments are considered in combination, it is clear that Freels can no longer perform the arduous duties of a welder for the railroad.

Freels worked as an assistant welder and subsequently a welder for Norfolk & Western Railroad from 1964 until 1982. In January 1979, Freels spent twenty-four days assisting in the clean up of a chemical spill in Sturgeon, Missouri. While laying on the ground to do the requisite welding, Freels came into contact with polychlorinated phenols, including dioxin. After this exposure to toxic chemicals, Freels was diagnosed as having the following impairments: headaches,[1] peripheral neuropathy,[2] distal paresthesia,[3] terminal intention tremor,[4] postural tremor, dystonic writer's cramp,[5] severe depression,[6] fatigue,[7] increased 24–hour calcium excretion, hypertriglyceridemia,[8] obstructive lung disease, lipoma,[9] stomatitis,[10] and mild to moderate brain dysfunction.[11] For these impairments, he has been prescribed Fiorinal,[12] Soma Compound,[13] Theo Dur,[14] and Motrin.[15] There is ample evidence in the record to indicate that Freels' medical and psychological problems directly resulted from exposure.[16]

### A. Ability to Perform Heavy Work

Under section 2(a)(1)(iv) of the Railroad Retirement Act, Freels need only show that

---

1. Headaches have been reported by the majority of persons exposed to dioxin. *The Relationship of Dioxin and Chlorinated Phenolic Substances to the Medical Problems in Man,* Tr. 189.

2. A term denoting functional disturbances and/or pathological changes in the peripheral nervous system. *Dorland's Illustrated Medical Dictionary* 1131 (27th ed. 1988) (*Dorland's*). Freels experiences feelings of numbness and tingling in both arms. Tr. 156. His arms tend to go to sleep when held in certain positions. *Id.* Ninety-six percent of the men exposed to dioxin at the Sturgeon spill exhibited symptoms of peripheral neuropathy. Tr. 153–54.

3. An abnormal sensation, such as burning or prickling. *Dorland's* at 1233. Ninety-three percent of the men exposed at the Sturgeon spill showed signs of distal paresthesia. Tr. 153–54.

4. A tremor which arises or which is intensified when a voluntary, coordinated movement is attempted. *Dorland's* at 1748. Seventy-eight percent of the men exposed to dioxin in Sturgeon experienced tremors. Tr. 153–54.

5. A muscle cramp in the hand caused by a disorder in the muscle tone. *Dorland's* at 392, 521, 1730. Freels experienced cramping in his fingers, especially when cold, when writing or when using tools. Tr. 157.

6. Depression and alteration of concentration have been found to be prominent in laboratory workers exposed to the chemical. Tr. 159, *citing* Oliver, *Toxic Effects of Dioxin in Laboratory Workers,* 32 Brit. J. Ind. Med. 49–53 (1975). *See also The Relationship of Dioxin and Chlorinated Phenolic Substances to the Medical Problems in Man,* Tr. 189 (same).

7. A sense of fatigue is common in patients who have been exposed to dioxin. Tr. 158. Eighty percent of the Vietnam veterans exposed to Agent Orange reported feelings of fatigue. *Id., citing* Bogen, *Symptoms in Vietnam Veterans Exposed to Agent Orange,* 242 Journal Am. Med. Assoc. 2391 (1979). *See also* Tr. 203. Ninety-one percent of the men exposed to dioxin in Sturgeon reported feelings of fatigue. Tr. 153–54.

8. An excess of glycerides, usually triglycerides, in the blood. *Dorland's* at 793. Increased cholesterol and triglycerides occur often in persons exposed to dioxin. Tr. 191.

9. A benign tumor usually composed of mature fat cells. *Dorland's* at 944.

10. Inflammation of the oral mucosa. *Id.* at 1585.

11. A disturbance, impairment or abnormality of the functioning of the brain. *Id.* at 517.

12. A pain reliever containing codeine used for all types of pain. *Physician's Desk Reference* 1868 (47th ed. 1988) (PDR).

13. A pain reliever used for discomfort associated with acute, painful musculo-skeletal conditions. PDR at 2169.

14. A bronchodilator which relaxes smooth muscles of bronchial airways and pulmonary blood vessels. PDR at 1093.

15. A pain reliever for mild to moderate pain. PDR at 2138.

16. The majority notes that Freels reached a settlement agreement with the railroad for $395,932.40 for the injuries sustained in 1979. Tr. 224. Lump–sum payments for personal injuries received on the job, however, do not destroy an individual's claim for an occupational annuity under the Railroad Retirement Act. *See Jacques v. United States Railroad Retirement Board,* 736 F.2d 34 (2d Cir.1984).

his impairments preclude him from performing *his regular railroad occupation.* 45 U.S.C. § 231a(a)(1)(iv). Employees with less than twenty years of railroad service must prove an inability to work at "any regular employment." 45 U.S.C. § 231a(a)(1)(v). As Freels was credited with the requisite twenty years of service, "he needed to show only that he was unable to perform his regular occupation * * *." *Welsh v. Railroad Retirement Board,* 665 F.2d 224, 225 (8th Cir.1981).

Under the regulations of the Social Security Administration,[17] a person who works at a job which involves lifting "no more than 100 pounds at a time with frequent lifting and carrying of objects weighing up to 50 pounds" is someone who does "heavy" work. 20 C.F.R. § 404.1567(d) Based on Freels' description of his duties as a welder, the referee concluded that Freels performed at the "heavy" exertional level while employed with the railroad. Tr. 8.

The referee then held that Freels could perform his past relevant work as a welder. In reaching this decision, she apparently relied on three factors: first, Freels' testimony that he was able to mow the lawn, vacuum and take out the garbage; second, the very limited medical reports submitted by three consulting physicians; and third, a decision to reject the medical reports of Freels' physicians as "conclusory."

17. The Railroad Retirement Board applies the relevant regulations of the Social Security Administration, 20 C.F.R. § 404.1 *et seq.,* to determine whether a person is eligible for an occupational disability annuity. *Arp v. Railroad Retirement Board,* 850 F.2d 466, 467 n. 2 (8th Cir.1988).

18. Freels testified as follows:
REF: * * * Now, do you ... let's talk about your activities that you do now. Do you do any kind of housework at all? Do you vacuum?
APP: I try to, yes.
REF: Okay. When you say you try to ... you do it and then you stop and rest?
APP: Right.
        *       *       *       *       *       *
REF: * * * What about taking out the garbage?
APP: Yes.

First, Freels' testimony with regard to his daily activities does not contradict his claim that he cannot perform heavy labor.[18] The evidence that Freels carries out the garbage, pushes a vacuum cleaner with frequent rests, and rides a lawn mower around a small yard does not prove that he can frequently lift up to 50 pounds. In any event, we have repeatedly stated that a claimant's ability to perform household chores is not evidence of his ability to perform work as these activities do not reflect real world work capabilities. *Jeffcoat v. Bowen,* 840 F.2d 592, 596 (8th Cir.1988); *accord Berven v. Gardner,* 414 F.2d 857, 861 (8th Cir.1969) (mere performance of light household duties does not prove the ability to engage in substantial gainful activity).

Second, none of the consultative physicians, relied on so heavily by the majority, ever concluded that Freels could perform heavy work. Dr. Gutensohn, Dr. Clarkson, and Dr. Whitener each saw Freels on one occasion at the request of the Board. Dr. Gutensohn made the equivocal diagnosis of "deterioration of health," and drew absolutely no conclusions as to Freels' ability to perform his job as a welder. Tr. 58–59. Dr. Clarkson confirmed that Freels suffers from obstructive pulmonary disease and chronic bronchitis and concluded that these two impairments were not, by themselves, severe enough to prevent Freels from carrying out *"some form* of gainful employment." Tr. 122 (emphasis added).

        *       *       *       *       *       *
REF: * * * I was asking you if you do any kind of garden work? Do you like mow the lawn?
APP: Yes.
        *       *       *       *       *       *
REF: Do you have a ... a rider mower or a push?
APP: Yeah.
REF: A rider. Okay. And how does that go? Do you do it a couple hours and rest or ...
APP: Oh, not that long, I imagine. It's not that large of a yard, but ... you know, I'll go through a little bit and stop.
REF: What about weeding? Do you do any kind of weeding or any other kind of yard work?
APP: Somewhat ... not too much.
Tr. 251–53.

Similarly, Dr. Whitener's report, which is limited to Freels' obstructive pulmonary disease, merely concludes that this single impairment is not "significant enough *to prevent him from working.*" [19] Tr. 139 (emphasis added). The majority glosses over the fact that these reports do not support the referee's findings by merely stating that, while "none of the doctors crafted their conclusions in language similar to that in § 2(a)(1)(iv), [they] *appear* to have concluded that he was not disabled for work in his regular occupation." (Emphasis added.) This inference conflicts, however, with the August 26, 1987 letter from the Medical Director at the Norfolk and Western Railroad Company who found that Freels was disqualified for *all service* with the company. Moreover, this Court should not postulate possible interpretations of vaguely worded medical reports. The obligation to clarify the record lies with the referee, a duty not adequately fulfilled in this case. Without a remand for further clarification from these physicians, we cannot assume that what they really *meant* to say was that Freels could return to his job as a railroad welder.

Furthermore, even were I to attribute the majority's interpretation to these reports, they merely dealt with Freels' physical impairments, and are thus too limited in scope to be determinative. As the referee correctly noted, a treating physician's report is ordinarily entitled to more weight than that of a consulting physician paid by the government for the purpose of defending against a disability claim. *Fowler v. Bowen,* 866 F.2d 249, 252 (8th Cir.1989); *Thompson v. Bowen,* 850 F.2d 346, 349 (8th Cir.1988). In light of the fact that the medical opinions of the Board's consulting physicians are equivocal and limited to only one or two of Freels' physical impairments, I feel their evidentiary weight is minimal at best.

In my view, the record clearly shows that Freels cannot perform his past heavy work.

Dr. Bernstein, a psychologist and vocational expert who examined Freels in 1981, performed several vocational functioning tests on Freels: the Crawford Small Parts Dexterity Test, the Purdue Pegboard Dexterity Test, the Valpar Work Sample 4 (Upper Extremity Range of Motion) test, the Valpar Work Sample 9 (Whole Body Range of Motion) test, the Laborimeter Test (sedentary and repetitive actions), and the Valpar Work Sample 8 (simulated assembly work) test. Tr. 53–54. He observed that Freels experienced cramping of the hands, stiffness in the fingers, back pain, and shortness of breath while performing the tasks in each test. Dr. Bernstein concluded "he could not get through a normal work day *in any task* in that most tasks require exertion, and because he requires a great deal of rest, in my judgment, this man is totally unemployable." Tr. 54 (emphasis added). Surprisingly, neither the referee nor the majority mention the extended testing Dr. Bernstein performed before reaching the conclusion that Freels was completely disabled. Moreover, a vocational expert, Dr. John T. Bopp, testifying at Freels' hearing on behalf of the Board, concluded that Freels would be unable to perform any job in the welding industry. Tr. 258–59. Thus, the vocational evidence presented by the board's expert supports Dr. Bernstein's conclusions.

Finally, the decision to reject Freels' medical reports as conclusory is factually and legally unsupportable. The medical specialists who examined Freels on a more regular basis agreed that, based on all of the diagnosed impairments, Freels definitely could not return to work as a welder and probably could not work at all. Yet, the referee discredited the medical reports of Dr. Carnow and Dr. Hueser, Freels' treating physicians, because their conclusions were "unsupported by clinical or laboratory findings."

The referee obviously misunderstood what is required under the regulations to

---

**19.** I agree with the referee that Freels' chronic obstructive pulmonary disease does not meet or equal one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1. Under section 3.02A, a person of Freels' height must have a forced expiratory volume (FEV1) of 1.6 and a maximal voluntary ventilation (MVV) of 64. The latest pulmonary tests available show that Freels' FEV1 measured 2.99 and his MVV measured 108.

support a claim for disability. Under 20 C.F.R. § 404.1508, a person's impairments must be demonstrable through "acceptable clinical and laboratory diagnostic techniques." A medical impairment, either physical or mental, must be established by medical evidence which includes "symptoms, signs and laboratory findings." 20 C.F.R. § 404.1528.[20]

The record contains a letter from Dr. Hueser which explains Freels' physical symptoms: fatigue, numbness of extremities (peripheral neuropathy) and shortness of breath. Tr. 87. He indicated that he has treated Freels for asthma with Theo Dur. He described observing the following signs: wheezing, the presence of a subcutaneous tumor on the right chest wall, and decreased reflexes in the lower extremities. He then concludes that Freels' fatigue, asthma, and peripheral neuropathy render him disabled.

Every physical impairment listed in Dr. Hueser's letter has been shown to exist by Freels' statements of his symptoms, other observable signs, and laboratory findings. The referee agreed that Freels' obstructive pulmonary disease and tumor were clearly evidenced by laboratory findings. Tr. 10 and 16. The diagnoses of peripheral neuropathy, as well as Freels' fatigue, terminal tremor, postural tremor, and dystonic writer's cramps, were confirmed by psychometric and neurologic tests performed by Dr. Klawans, Tr. 155–59, 164–65, 181, and Dr. David Egilman, Tr. 182–86. It is difficult to imagine how one man could amass any more clinical or laboratory findings for the purpose of demonstrating an inability to work. The majority makes much of the fact that Freels' blood tests, EKG, urinalysis and chest x-rays were "normal." These test results would be relevant were Freels claiming a disability based only on a heart or lung impairment. In this case, however, Freels alleged that the exposure to toxic chemicals has caused *neurological* damage

in addition to lung damage. None of the minimal tests performed by the Board's consulting physicians could have evaluated this claim.

I believe this record is replete with the requisite medical evidence and I cannot accept, as the majority easily does, that the opinions of Dr. Hueser, Dr. Carnow, Dr. Klawans and Dr. Egilman are "conclusory" and "unsupported by clinical or laboratory findings." Nothing could be farther from the truth in this case.

B. *Failure to Evaluate Claimant's Psychological Impairments*

In addition to the physical and vocational limitations, Freels suffers from psychological impairments which were not considered by the referee. Dr. Roehlke, a psychologist, performed the Minnesota Multiphasic Personality Inventory (MMPI) on Freels in 1985 and concluded that Freels suffered from depression and fatigue. In establishing a diagnosis of anxiety disorder and adjustment disorder with mixed emotional features, she stated: "These psychological disorders, in combination with known physical disabilities would likely preclude his being able to successfully accomplish employment in any ordinary setting." Tr. 129.

Furthermore, Dr. Caine, the Director of the Neuropsychiatry Program at the University of Rochester Medical Center, and Dr. Como, the Clinical Director of the Neuropsychology Laboratory, evaluated Freels' psychological state based on scores from a General Health Questionnaire (GHQ), the Beck Depression Inventory (BDI), the Global Assessment Scale (GAS) and the MMPI. They found:

Mr. Freels' cognitive test data revealed significantly compromised attention/concentration abilities. Immediate and recent memory functioning were also mildly impaired. The majority of Mr.

---

**20.** A "symptom" is the claimant's own description of his or her physical or mental impairment. 20 C.F.R. § 404.1528. A "sign" is an anatomical, physiological or psychological abnormality which can be observed. *Id.* Signs are shown by medically acceptable clinical diagnostic techniques. "Laboratory findings" are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. *Id.*

Freels' cognitive deficits centered around visual tracking and perceptual motor integration. Performance on these tasks were considered within the moderately severe range. Within this context of poor concentration and mental tracking, immediate and recent memory functioning, especially for verbal information, were impaired. Mr. Freels had considerable difficulty recalling short stories read to him and learning a list of word pairs. Recall after a short delay was also impaired; the use of cued recognition enhanced recall marginally. * * *

Mr. Freels' MMPI profile was suggestive of increased depression, tension and anxiety. Preoccupation with somatic concerns and physical complaints of chronic pain were also features of this profile.

Mr. Freels' GHQ and BDI scores reflect significant psychopathology. His GAS score is indicative of moderate to severe symptoms, which at this time would be diagnosed as dysthymic disorder. This diagnosis, however, is at the border zone between dysthymic disorder and major depressive disorder. Mr. Freels is in need of treatment intervention. Tr. 209.

The referee, however, disregarded these evaluations. She stated that "even if the reports of Ms. Roehlke and Dr. Caine and Mr. Como are considered, there is no evidence in the record that appellant is taking any medication for emotional functioning, nor is he seeing a psychiatrist, psychologist, or any type of therapist." Tr. 14. Based on this fact, the referee felt that the reports did not show that Freels' mental impairments rendered him incapable of performing his previous work as a welder. *Id.*

The regulations do not require that a claimant must be seeing a psychiatrist in order to show that a mental disorder impairs his or her functioning. Section 404.-1545(c) states that when determining whether a mental impairment affects a claimant's residual functional capacity, the Secretary (or in this case, the Board) is to assess the claimant's "ability to understand, to carry out and remember instruc-

tions, and to respond appropriately to supervision, co-workers and work pressures in a work setting." 20 C.F.R. § 404.1545(c).

Under this standard, the reports of Drs. Roehlke, Caine and Como demonstrate that Freels' ability to concentrate on a particular job, remember short instructions and physically carry out these instructions are significantly impaired. Similarly, his depression and his anxiety disorder may affect his ability to tolerate any work setting. Dr. Bopp, the Board's vocational expert, testified that if Freels suffered from immediate recent memory function and has difficulty with concentration, attention, and perceptual motor integration, "very few" light work jobs would be available for Freels. Tr. 260. Thus, the Board's own vocational expert concedes that Freels' ability to perform light work is severely limited.

Instead of carefully considering these factors, the referee dismissed the reports as meaningless merely because Freels was not seeing a psychiatrist. In so doing, the referee avoided the task of evaluating how Freels' undisputed mental impairments affect his ability to work as a welder. We have consistently held that an ALJ must show that she evaluated *all* the evidence before rendering a decision. *Herbert v. Heckler,* 783 F.2d 128, 130 (8th Cir.1986). She may not disbelieve a claim by ignoring medical evidence. *Chitwood v. Bowen,* 788 F.2d 1376, 1377 (8th Cir.1986) (per curiam). Furthermore, the ALJ must consider the combined effect of the claimant's impairments in assessing disability. *Vaughn v. Heckler,* 741 F.2d 177, 179 (8th Cir.1984). I believe the referee committed legal error by failing to follow these basic analytical steps.

The majority relies on the report of the Board's psychologist, Blake Andersen, to counter the conclusions drawn by Roehlke, Caine and Como. Yet, Andersen specifically cautioned the Board:

The above conclusions are based on a very limited evaluation. Although intellectual testing is useful for assessing work-related abilities and general intel-

lectual functioning, personality and neuropsychological testing are needed to properly assess this individual's psychological functioning. Given the limited funds available for this evaluation, testing of this type was not possible. *Consequently, the above conclusions should be regarded as tentative and incomplete. Neuropsychological testing is clearly indicated to screen for deficits resulting from this individual's exposure to toxic chemical.* Tr. 136 (emphasis added).

Thus, Andersen's report does *not* contradict the personality testing results of Dr. Roehlke or the neuropsychological test results of Drs. Caine and Como.

In sum, substantial evidence does not exist in this record to support the referee's findings. Because the evidence as to Freels' disability is overwhelming, I would reverse the decision of the referee and award an annuity to Freels.